# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MICHAEL WASHINGTON,

      Plaintiff,

    v.

CITY OF CINCINNATI, et al.,

      Defendants.

Case No. 1:23-cv-230

Bowman, M.J.

## MEMORANDUM OPINION AND ORDER

After he was summarily fired from his position as Fire Chief for the City of Cincinnati, Plaintiff Michael Washington sued the City of Cincinnati and the City Manager, Defendant Sheryl Long, in her individual and official capacities, asserting four claims under federal and state law. Following discovery, the parties moved for summary judgment. The Court now grants partial judgment to both Plaintiff and Defendants.

Below, the Court draws the following conclusions: (1) Defendants violated Plaintiff's pretermination due process rights; (2) a jury issue remains concerning the adequacy of the post-termination hearing that was offered to Plaintiff and whether he waived that hearing; and (3) Long is entitled to qualified immunity in her individual capacity for the post-termination due process claim. In addition, the Court concludes that the City is entitled to statutory immunity for Washington's defamation claims under state law. All remaining issues must await trial.

## I.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## II.    Findings of Fact

From March 1993 until his termination in March 2023, Plaintiff served in multiple roles as a member of the City of Cincinnati Fire Department. In May 2021, Plaintiff was promoted to the position of Chief of the Cincinnati Fire Department ("Fire Chief"). As Fire Chief, Plaintiff oversaw a workforce of about 800 employees.

Plaintiff's thirty-year career came to an abrupt close on March 24, 2023, when he was summoned to a meeting at City Hall. City Manager Sheryl Long and two Human Resources representatives attended the meeting. Once Washington arrived, Long told Washington that he was being terminated, effective immediately, and handed him a termination letter. The termination letter accused Plaintiff of various leadership and conduct failures, including: (1) poor workplace culture; (2) absence from a high-rise fire; (3) mishandling of personnel matters regarding a lieutenant charged with assault; (4) ineffective management of the acquisition of a training facility; and (5) ineffective communication with Long and others. (Doc. 36-2.)

When she left the meeting, Long notified the Mayor and members of City Council that Plaintiff had been terminated for cause. (Long Depo., Doc. 36, PageID 1226.) In a

Memorandum entitled "For Your Information," Long listed her reasons for terminating Washington, and announced his interim replacement. (Doc. 36-4, PageID 1529.) The same morning, Long notified media outlets of Washington's termination and replacement, providing a copy of the termination letter and making statements in interviews consistent with the statements in the termination letter and Memorandum. (Doc. 36-24, 36-25.)

Plaintiff requested a post-termination hearing before a neutral decisionmaker. Defendants responded by offering a post-termination hearing before Long, citing to the City Charter. (Doc. 40-7, PageID 1800.) No hearing was ever held.

### III. Analysis of Legal Issues Presented in Cross-Motions

### A. Identifying Plaintiff's Claims

Prior to addressing the pending motions, the Court will first identify Plaintiff's claims. Washington's complaint sets out four separate claims, including two separate procedural due process claims under the Fourteenth Amendment of the United States Constitution (Count I) and under the Due Course of Law Clause in Article 1, Section 16 of the Ohio Constitution (Count II), plus a declaratory judgment claim (Count III) and defamation (Count IV). (Doc. 17). Counts I, II, and IV are asserted against Defendant Long in both her official and individual capacities, and separately against the City. Count III is asserted only against the City and Long in her official capacity. To the extent that Plaintiff asserts identical claims against Long in her official capacity and against the City, those claims are entirely duplicative. *See e.g., Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985). In addition to the duplication of all four claims against Long in her official capacity and the City, Count II and the first portion of Count III are construed as essentially part and parcel of the same claim.

3

Federal law provides for a private right of action to recover damages for the alleged violations of Washington's federal constitutional rights. *See* 42 U.S.C. § 1983. But there is no state law equivalent to 42 U.S.C. § 1983. So state law does not provide for an independent right of action to enforce the Due Course of Law Clause, as set forth in Count II. *See Autumn Care Ctr., Inc. v. Todd*, 22 N.E.3d 1105, 1110 (Ohio Ct. App. 2014) (citation omitted); *Moore v. City of Cleveland*, 388 F.Supp.3d 908, 919 (N.D. Ohio May 21, 2019) ("Ohio law does not authorize private suits for violations of the Ohio Constitution."); *Gibson v. Mechanicsburg Police Department*, 2017 WL 2418317, *5 (S.D. Ohio June 2, 2017). Because Ohio has not recognized an independent claim for a violation of the state Due Course of Law Clause, this Court declines to do so. *See generally*, *Hagedorn v. Cattani*, 715 Fed. Appx. 499, 508 (6th Cir., 2017) (declining to recognize private cause of action to enforce the free speech rights under Ohio constitution.) Though he cannot recover monetary damages for the alleged separate violation of his state constitutional due process rights, Plaintiff can pursue his state law declaratory judgment claim concerning the same alleged constitutional violation. *Autumn Care Ctr., Inc.*, 22 N.E.2d at 1110.

With the nature of the claims sufficiently identified, the Court begins by evaluating whether Plaintiff possessed a constitutional interest over which procedural due process protections attached.[1] Plaintiff moved for summary judgment on Counts I and II. But Plaintiff cannot recover for Count II other than through the portion of Count III that seeks a declaratory judgment that Plaintiff can be terminated only "for cause" under state law.

---

[1] Within the context of Plaintiff's declaratory judgment claim, the analysis of the due process protection afforded by Ohio's Due Course of Law Clause is coextensive with the federal Due Process Clause. *State v. Anderson*, 68 N.E.3d 790, 794 (Ohio 2016). (*See also* Opinion and Order, Doc. 13, n.3, PageID 163).

Therefore, the Court construes Plaintiff's motion on Count II as also seeking judgment on the sole mechanism for finding a violation – the portion of his declaratory judgment claim in Count III that seeks a declaration that he may be terminated only "for cause." Defendants have filed a cross-motion for summary judgment on all claims.

### B. Plaintiff's Property Interest

"Procedural due process requires notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner' if the State seeks to deprive someone of constitutionally protected liberty or property interests." *Hieber v. Oakland Cnty., Michigan*, 136 F.4th 308, 321 (6th Cir. 2025) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Defendants previously moved to dismiss Plaintiff's due process claims, in part based on their argument that Washington was an "at will" employee who lacked any constitutionally protected property interest. Without a property interest, Plaintiff's due process claims and his related declaratory judgment claim would fail.

In a February 7, 2024 Opinion and Order written by U.S. District Judge Douglas R. Cole, this Court denied Defendants' motion, in part because "the City Charter gives Washington a vested, due-process-protected property interest in his continued employment as Fire Chief." (Doc. 13, PageID 172.) Defendants now urge the undersigned to revisit that ruling.

Defendants concede that before November 6, 2001, the Fire Chief held a property interest in continued employment. But Defendants insist that the 2001 amendment to the City Charter eliminated that interest by recategorizing the position as an "unclassified civil service" employee under Ohio law. The relevant amendment reads, in pertinent part:

> The positions of fire chief and assistant fire chief shall be in the unclassified civil service of the city and exempt from all competitive examination

requirements. The city manager shall appoint the fire chief and the assistant fire chiefs to service in said unclassified positions. The police chief and assistant police chiefs shall be appointed solely on the basis of their executive and administrative qualifications in the field of law enforcement and need not, at the time of appointment, be residents of the city or state. The fire chief may be removed at any time by the city manager. After the fire chief has served six months, he or she shall be subject to removal only for cause including incompetency, inefficiency, dishonesty, insubordination, unsatisfactory performance, any other failure of good behavior, any other acts of misfeasance, malfeasance, or nonfeasance in office, or conviction of any felony. If removed for cause the fire chief may demand written charges and the right to be heard thereon before the city manager. Pending the completion of such hearing the city manager may suspend the fire chief from office.

Charter, Art. V, § 6.

Property interests are determined by reference to state law. *See Bishop v. Wood*, 426 U.S. 341, 344 (1976). The phrase "removal…for cause" is widely recognized as a term of art in the employment context, including under Ohio law. The Court previously reasoned that the amended Charter language creates no property interest upon *appointment* because the position of the Fire Chief "is terminable at will for the first six months of his tenure." (Doc. 13, PageID 171.) But the Court held that Plaintiff had plausibly pleaded that a property interest was established after six months, when "the Fire Chief becomes a vested for-cause position." (*Id*.) Because Plaintiff had served as Fire Chief for roughly two years, Plaintiff possessed "a cognizable property interest in his employment under the express language of the City's Charter, which made him removable only 'for cause.'" (Doc. 13, PageID 161.)

Arguably, the Court could decline to revisit its prior ruling on grounds that it has been settled as the "law of the case." [2]

---

[2]Defendants did not move Judge Cole for reconsideration or otherwise attempt to file any appeal. Two and half months after Judge Cole's ruling, however, the parties consented to the jurisdiction of the undersigned magistrate judge under 28 U.S.C. § 636(c) (Docs. 20, 21.)

> Under the law-of-the-case doctrine, a court "should not reconsider" a legal issue it "resolved" at a prior stage of the same case. *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015) (quotation marks omitted). In other words, when the "*same* issue" is presented "in the *same case*" to the "*same court*," the "*same result*" should follow. *Id.* (quoting *Sherley v. Sebelius*, 689 F.3d 776, 780 (D.C. Cir. 2012)). The doctrine thus "encourage[s] efficient litigation" and "deter[s] indefatigable diehards." *Id.* at 740 (quotation marks omitted). Indeed, without it, "an adverse judicial decision would become little more than an invitation to take a mulligan, encouraging lawyers and litigants alike to believe that if at first you don't succeed, just try again." *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1240 (10th Cir. 2016) (Gorsuch, J.).

*Ermold v. Davis*, 130 F.4th 553, 559 (6th Cir. 2025); *see also, generally, Arizona v. California*, 460 U.S. 605, 618 (1983) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"); *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (the law-of-the-case doctrine "promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues'" (citation omitted)); *Mabry-Schlicher v. Comm'r of Soc. Sec.*, No. 24-cv-3811-MJN-SKB, 2025 WL 1604376 *4 (6th Cir. June 6, 2025) (holding that this Court erred in reconsidering legal issue decided in prior remand order under the "law of the case" doctrine).

Defendants maintain that the doctrine "applies only to decisions made on appeal and does not prevent a District Court from changing its mind while a case is pending." (Doc. 42, PageID 1820). *See United States ex rel. Holbrook v. Brink's Co.*, 336 F. Supp. 3d 860, 867 (S.D. Ohio 2018) ("Sixth Circuit precedent establishes that the law-of-the-case doctrine is confined to circumstances in which the district court is evaluating issues already decided by an *appellate* court, and does not bind district courts in reevaluating its own determinations.") (internal citations omitted, emphasis original). But "[u]nlike the more precise requirements of res judicata, law of the case is an amorphous concept."

*Arizona*, 460 U.S. at 618. And no less an authority than the Supreme Court has cautioned that the fact that a court has the power to revisit its own prior decisions does not mean that it should. "[A]s a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson*, 486 U.S. at 817 (1988) (quoting *Arizona, supra,* 460 U.S., at 618, n. 8 (additional citation omitted)).

Defendants further argue that the doctrine is inapplicable because the Court's prior ruling was made at the motion-to-dismiss stage. After all, the question previously answered by the Court was whether Plaintiff had stated a plausible claim upon which relief could be granted, whereas on summary judgment, the question is whether a genuine issue of material fact exists. *See Brink's Company*, 336 F. Supp. 3d at 862. So the doctrine does not preclude reconsideration when the earlier ruling is based on allegations that have been disproven after development of the factual record. *See*, *e.g.*, *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000); *Taylor v. City of Saginaw*, 11 F.4th 483, 487 n.1 (6th Cir. 2021). Here, however, Defendants do not rely on additional *facts*[3] but on their preferred legal interpretation of the City Charter. This

---

[3]Defendants briefly cite to a 2014 memorandum written by then-City Manager Harry Black that Defendants maintain is "consistent with" the City's legal interpretation. (Doc. 40-9.) In it, Black opines that the 2001 amendment to the City Charter

> included significant changes from the civil service-based examination process previously controlling those positions. As amended, …the Charter … now authorizes the Manager to appoint and remove the Police Chief and Assistant Police Chiefs, and the Fire Chief and Assistant Police (sic) Chiefs. *After serving for six months, the Police and Fire Chiefs may be removed only for cause per the Charter*. If removed for cause, the Charter currently provides that a Police Chief or Fire Chief may demand to receive written charges and to be heard on the charges before the Manager.

(Doc. 40-9, PageID 1814, emphasis added.)

> Defendants do not include the above contextual quotation but pull out a sentence wherein Black opines: "Like all other department heads under the City Manager, the Police Chief and the Fire Chief serve in an at-will employment relationship." Aside from being quoted out of context, the referenced statement is not persuasive legal authority. "It is the function of the trial judge to determine the law of the case." *United States v. Zipkin,* 729 F.2d 384, 387 (6th Cir.1984).

Court's prior ruling was based on, and thoroughly considered, the very same Charter language. *Contrast Kanuszewski v. Michigan Department of Health and Human Services*, 141 F.4th 796, 803-804 (6th Cir. 2025) (holding that an earlier ruling that contained "conclusory legal statements" based on assumptions at the motion-to-dismiss stage did not establish binding law because that ruling had not involved the type of detailed and in-depth analysis of the issues that was required on summary judgment.)

Even assuming that the law-of-the-case doctrine does not strictly apply, the undersigned nevertheless agrees with and therefore adopts the Court's thorough prior analysis for purposes of summary judgment on the now-developed record.

> [T]he proper question is whether the position of Cincinnati Fire Chief constitutes a public employment position for which the officeholder, here Washington, can be fired only for cause. Defendants' problem is that the answer to that question is clearly yes. The Charter of the City of Cincinnati…plainly states that "[a]fter the fire chief has served six months, he or she shall be subject to removal only for cause[.]" Charter of the City of Cincinnati, Art. V, § 6 … The Amended Complaint alleges Washington was in his position for nearly two years from May 2021 until March 24, 2023. (Doc. 7 ¶¶ 12, 27, #64, 67). As a Fire Chief with more than six-months' tenure, Washington was entitled to the attendant for-cause-removal protections. And under well-established caselaw, he therefore held a constitutionally protected property interest in his continued employment.

(Doc. 13, PageID 168-169.) (citing *Savage v. City of Pontiac*, 483 Fed. Appx. 943, 946 (6th Cir. 2012)).

As it did in its February 2024 ruling, the Court again rejects Defendants' arguments that the Charter's description of the Fire Chief as an "unclassified" employee was "talismanic, thereby extinguishing any constitutional protections that may otherwise arise due to the for-cause removal provision." (Doc. 13, PageID 169.)

> [Y]es, the Charter describes the Fire Chief as an "unclassified civil service" position "exempt from all competitive examination requirements." (Charter, Art. V, § 6, Doc. 7-1, #79). But importantly, it then goes on to state that after

six months of service, the Fire Chief position becomes terminable "only for cause" and details what constitutes cause justifying termination. (Id. (emphasis added)). There is no more explicit way to designate the Fire Chief position, when held beyond six months, as a classified (in the legal-term-of-art sense of the word), for-cause-terminable position. And as Washington was a Fire Chief entitled to for-cause removal, he possessed a cognizable property right in his classified (in the legal-term-of-art sense) position protected by the Due Process Clause.

Against that backdrop, the Charter's reference to the position as "unclassified" cannot overcome the fact that, as a matter of substance, the Fire Chief has "an individual entitlement [to the position] grounded in state law, which cannot be removed except for cause." *Kaplan*, 10 F.4th at 578. As the Supreme Court has recognized across many contexts, "we must be careful to consider the substance of the rights state law provides, not merely the labels the State gives these rights or the conclusions it draws from them. Such state law labels are irrelevant to the federal question of which bundles of rights constitute property" for federal law purposes. *United States v. Craft*, 535 U.S. 274, 279 (2002); *cf. Tyler v. Hennepin Cnty.*, 598 U.S. 631, 638 (2023) ("The Takings Clause does not itself define property. For that, the Court draws on existing rules or understandings about property rights. State law is one important source. But state law cannot be the only source. Otherwise, a State could sidestep the Takings Clause by disavowing traditional property interests in assets it wishes to appropriate." (cleaned up)). Just the same here. The City's use of the "unclassified" label cannot overcome the core of Washington's interest in being Fire Chief, which "rises to the level of a constitutionally protected property interest." *Savage*, 483 F. App'x at 946. Simply, as a Fire Chief with an excess of six months of service, he was a for-cause employee who merits due process protections. As a result, all the cases Defendants cite finding no property interest in truly unclassified (i.e., at-will, not for-cause, positions) are inapplicable here.

(Doc. 13, PageID 170-171.)

The Court also rejects Defendants' argument that the phrase "for cause" in the Charter merely refers to "the process to be afforded." Again, the undersigned adopts and reaffirms the Court's prior analysis.

Defendants are correct that merely promising process to an employee does not create a property interest in one's continued employment if the employee remains terminable at will. *McClain v. Nw. Cmty. Corr. Ctr. Jud. Corr. Bd.*, 440 F.3d 320, 330 (6th Cir. 2006) ("Because McClain may be dismissed without cause, she … lacks a property interest for federal procedural due process purposes, notwithstanding the fact that state law

provides her some procedural protection."). But that is not what the Charter does. The Fire Chief is terminable at will for the first six months of his tenure. Once those six months pass, the Fire Chief becomes a vested for-cause position. So, by the Charter's own terms, Washington was converted into a for-cause employee. For Defendants' theory to withstand scrutiny, the Court would need to pretend that language making the Fire Chief terminable "only for cause" - followed by a list of permissible reasons justifying that termination - does not really mean terminable for cause. (Charter, Art. V, § 6, Doc. 7-1, #79). The Court will not accede to the linguistic gymnastics needed to justify that reading.

(Doc. 13, PageID 171-172.)

In seeking reconsideration at the summary judgment stage, Defendants cite to much of the same case law they previously relied upon, including *Bishop v. Wood,* a case in which the Supreme Court affirmed a lower court's determination that - despite language in a city ordinance that limited discharge of a "permanent" employee - the ordinance "grant[ed] no right to continued employment but merely condition[ed] an employee's removal on compliance with certain specified procedures." *Id*., 426 U.S. at 345. Defendants argue that the same is true here: The Fire Chief remained an unclassified "at will" employee despite being guaranteed some procedural protections after six months.

But *Bishop*'s holding rested *on* the lower courts' interpretation of North Carolina law and not Ohio law. The Supreme Court acknowledged that the ordinance easily could have been interpreted to establish a property interest under a different interpretation of state law.

On its face the ordinance on which petitioner relies may fairly be read as conferring such a guarantee [to continued employment]. However, such a reading is not the only possible interpretation; the ordinance may also be construed as granting no right to continued employment but merely conditioning an employee's removal on compliance with certain specified procedures.

*Id*., 426 U.S. 341, 345 (1976). The Court elected to defer to the trial court's interpretation, because the district judge sitting in North Carolina had cited some support, was very familiar with state law, and there was no "authoritative interpretation of this ordinance by a North Carolina state court." *Id*. at 345. Because that "tenable" interpretation already had been upheld by the Court of Appeals, the Supreme Court stated it would accept it "even if an examination of the state-law issue without such guidance might have justified a different conclusion." *Id*. at 346-347.

As in *Bishop*, the undersigned concludes that the previously-presiding district judge provided a well-reasoned explanation of why, under *Ohio* law, the Charter language grants a property interest in continued employment to the Fire Chief after six months. *See also*, *generally*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) (holding that a classified employee who can be terminated only "for cause" under Ohio law retains a property interest in continued employment.) That an alternate interpretation of the Charter language is *possible* does not mean that the undersigned is required to accept it – particularly where, as here, the Court's prior analysis is persuasive. *See also Haven v. Lodi*, 200 N.E.3d 395, 404, 2022-Ohio-3957, ¶ 22 (Ohio App. 9 Dist., 2022) (holding that under Ohio law, a property interest in continued employment is created when a police officer can be terminated "only for just or reasonable cause[]….") (additional citations omitted); *Gross v. Village of Minerva Park Village Council*, 997 F.Supp.2d 813, 819 (S.D. Ohio, 2014) (unclassified village police officers still have a constitutionally protected property right in continued employment based on statute that prohibits termination except for cause).

Last, the Court again rejects Defendants' argument that *Prophett v. City of Cincinnati*, No. 1:17-cv-699-TSB, 2018 WL 11473295 (S.D. Ohio Aug. 3, 2018), previously interpreted the same Charter language to mean that the Fire Chief has no property interest in continued employment. The facts of *Prophett* involved a firefighter under civil service provisions who sought but was twice denied a promotion to the position of Assistant Fire Chief. The plaintiff's suit was based in part on his argument that under classified civil service rules, he should have been appointed as the most qualified individual. In other words, the issue in that case was whether he had a property interest in the *initial appointment* to the position. He alleged that the City Manager had denied him the appointment in retaliation for actions that Prophett had taken in 2015. Emphasizing the Charter language that removes the position of Assistant Fire Chief from the usual competitive civil service requirements, the Court granted a motion to dismiss Prophett's procedural due process claim.

> The City Charter expressly categorizes the position of Assistant Fire Chief as "in the <u>unclassified civil service</u> of the city and exempt from all competitive examination requirements." Charter of the City of Cincinnati, Art. I, Sec. 6 (emphasis added). Mr. Prophett does not have a constitutionally protected property interest in the unclassified position of Assistant Fire Chief.

*Id.*, 2018 WL 11473295, at *9 (emphasis in original). *Prophett* never considered the unique Charter language that specifically bars removal of the Fire Chief (but not the Assistant) after six months of employment except "for cause." That "for cause" language effectively converts the Fire Chief position alone to "a classified (in the legal-term-of-art sense of the word), for-cause-terminable position" after six months. (Doc. 13, PageID 170.) *See also Gross, supra*, 997 F.Supp.2d at 819. Defendants cite to no contrary

evidence in the developed record to dispute that legal interpretation of the Charter. Therefore, at the time of Washington's termination, he held a property interest in his continued employment.

### C. Whether Plaintiff Prospectively Waived his Property Interest

Defendants alternatively argue in support of summary judgment that Plaintiff "waived any property interest in continued employment." (Doc. 40 at PageID 1743.) In support of waiver, Defendants point to a Memorandum signed by Plaintiff, the City Manager and the Director of Human Resources dated May 14, 2021, with the subject line: "Understanding of Unclassified Appointment." The relevant text reads:

> The position of Fire Chief is an unclassified position.
>
> Employees accepting employment in unclassified positions serve at the pleasure of the appointing authority and can be dismissed from employment without cause at any time. In addition, unclassified employees are not recognized under the Civil Service system and are, therefore, not afforded civil service protections and/or hearings granted to classified employees. In accepting unclassified appointments, employees forfeit the right to seek other employment via lateral transfers and the opportunity to take competitive, promotional exams.
>
> By signing below, I, Michael A. Washington, Sr., understand that the position of Fire Chief, which I am accepting, is an unclassified position and that I have read and understand the explanation of unclassified positions detailed in this document.

(Doc. 40-2, PageID 1754.)

Due process rights are subject to waiver. *See*, *generally*, *Buddie v. Connecticut*, 401 U.S. 371, 378-379 (1971). For example, an Ohio public employee may waive his right to a pretermination hearing if he voluntarily resigns from a position before a hearing is held. *See Brown v. Columbus Bd. of Ed.,* 638 F. Supp. 2d 856, 863-854 (S.D. Ohio 2009). And case law generally supports the City's premise that the parties could, by contract,

override the express Charter language. In *Corbett v. Garland*, 228 Fed. Appx. 525 (6th Cir. 2007), for example, the Sixth Circuit reversed a denial of qualified immunity after reasoning that a state university president could enter into an employment contract that categorized a position as "unclassified" under Ohio law even if the position otherwise would be designated as "classified" by statute. The Sixth Circuit held that it was reasonable for the university president to believe that the employee was estopped from asserting her classified status based on her prior explicit agreement, after consultation with counsel, to an at-will employment contract. "[I]n the waiver-and-estoppel context, whether an employer has "designated" a position as unclassified must include situations in which the employer informs the employee that it views the position as unclassified, *even if the position is classified under the statute." Id.*, 238 Fed. Appx. at 533-534 (emphasis original).

Assuming that the City and Plaintiff could enter into an employment contract that prospectively eliminated any future property right that could accrue after six months,[4] the question remains whether they did. After all, courts "do not presume acquiescence in the loss of fundamental rights." *Ohio Bell Tel. Co. v. Public Util. Comm'n of Ohio*, 301 U.S. 292, 307 (1937).

Plaintiff contends that the May 14, 2021 Memorandum is not a knowing, voluntary and intelligent waiver of a prospective property right that had not yet accrued. Instead, he

---

The 2014 Memorandum by then-City Manager Black cited by Defendants in support of their "at will" interpretation of Washington's employment status includes Black's opinion that it would be improper to enter into any written employment contracts for the designated positions because to do so would be "contrary to the spirit of" the Charter amendment. (Doc. 40-9.) *See also State Emp. Relations Bd. v. Queen City Lodge No. 69, Fraternal Order of Police*, 883 N.E.2d 1083, 1090, 174 Ohio App.3d 570, 580, 2007-Ohio-5741, ¶ 37 (Ohio App. 1 Dist. 2007) (suggesting that the City Charter language "must be obeyed" because the "voters have the last word," and the City and union are not free to "simply ignore" the 2001 Charter amendment in a collective bargaining agreement).

insists that the Memorandum merely reiterates his understanding that "AT THE TIME HE WAS HIRED the Chief was terminable at will." (Doc. 44, PageID 1861, emphasis original.) Plaintiff maintains that the Memorandum language "does not change – or even PURPORT to change – the Charter provision that he would be removable ONLY for cause if he remained employed in the position after six months." (*Id*., emphasis original.)

The Charter language that limits removal of the Fire Chief alone "only for cause" stands in stark contrast with the generic Memorandum language that states categorically that employees "in unclassified positions serve at the pleasure of the appointing authority and can be dismissed from employment without cause at any time." (Doc. 40-2.) Because the City has provided no evidence that it made clear its intention that the Memorandum was intended to override the more specific City Charter, the Court finds the alleged contractual "waiver" to be – at best – ambiguous. *Compare Gross,* 997 F.Supp.2d at 819 (holding that "unclassified" village police officers still have property right based on statute that prohibited termination except for cause). Construed against the City as the drafting party, the Court finds for Plaintiff that his signature on the Memorandum does not represent a knowing, voluntary, and intelligent waiver of the "for cause" protections that accrued after six months of employment. *See also*, *generally*, *Hoover v. Radabaugh*, 123 F. Supp. 2d 412, 423 (S.D. Ohio 2000) (declining to find a knowing, voluntary or intelligent waiver of a pretermination hearing in an employment contract where, despite being "well educated," the plaintiff did not have the advice of counsel when he signed the waiver and mistakenly believed that by signing the form, the hearing would be rescheduled.)

### D. Whether Plaintiff Received Due Process

Having established that Plaintiff held a property interest at the time of termination and that he did not waive his right to procedural due process, the Court turns to whether Plaintiff was afforded sufficient process both before and after his termination.[5] Based on the record presented, the Court grants partial summary judgment to Plaintiff on his claim that Defendants violated his federal due process rights (Count I) and on his related state constitutional claim only to the extent that he seeks declaratory relief that after six months, he could be terminated only for cause and is entitled to state constitutional protections co-extensive with the Due Process Clause. (Counts II and part of Count III construed together).

### 1. Defendants Failed to Provide Plaintiff with Pretermination Process

In *Loudermill*, the Supreme Court reiterated that "'the root requirement' of the Due Process Clause… [is] 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Id.*, 470 U.S. at 542 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis in original)). Although a full, trial-type evidentiary hearing before a neutral arbiter is not required before termination so long as the employee has access to a more rigorous post-termination hearing, *some* type of pretermination hearing is always required "to provide an initial check against mistaken conclusions, 'essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'"

---

[5]Because Plaintiff's First Amended Complaint contained no "non-conclusory allegations" relating to the denial of post-deprivation process, the Court construed that pleading to raise "state and federal due process claims premised on Defendants' alleged deprivation of *only pretermination process.*" (Doc. 13, n. 5, PageID 167, emphasis added.) Plaintiff's Second Amended Complaint includes additional factual allegations to raise plausible post-deprivation process claims. (*See* Doc. 17, ¶¶48-50).

*Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004) (quoting *Loudermill*, 470 U.S. at 545-46). "Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect." *Loudermill*, 470 U.S. at 543 (additional citations omitted).

No one disputes that the Charter language gave City Manager Long the authority to fire Plaintiff, albeit "only for cause" given his length of service. But even the Charter language confirms that a pretermination hearing before the City Manager was required. "If removed for cause the fire chief may demand written charges and the right to be heard thereon before the city manager. Pending the completion of such hearing the city manager may suspend the fire chief from office…." Article V, Section 6. While somewhat awkwardly phrased, the fact that the Charter language dictates a **pre**- and not a **post**-termination hearing is contextually clear. Until the hearing on written charges is completed, the Charter grants only limited authority to the city manager to "suspend" the fire chief.

In *Loudermill*, the Supreme Court explained that suspension with pay strikes a balance between a government's interest in immediate termination and an employee's constitutional right to a pretermination hearing.

> [A]ffording the employee an opportunity to respond prior to termination would impose neither a significant administrative burden nor intolerable delays. Furthermore, the employer shares the employee's interest in avoiding disruption and erroneous decisions; and until the matter is settled, the employer would continue to receive the benefit of the employee's labors. It is preferable to keep a qualified employee on than to train a new one. A governmental employer also has an interest in keeping citizens usefully employed rather than taking the possibly erroneous and counterproductive step of forcing its employees onto the welfare rolls. *Finally, in those*

*situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay.*

*Loudermill*, 470 U.S. at 544-45 (emphasis added, footnote omitted).

For more than twenty years now, Sixth Circuit case law has confirmed that "prior to termination of a public employee who has a property interest in his employment, the due process clause requires that the employee be given 'oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer.'" *Farhat v. Jopke*, 370 F.3d at 595 (quoting *Buckner v. City of Highland Park,* 901 F.2d 491, 494 (6th Cir. 1990) (additional citation omitted)). Thus, before executing her authority to terminate Washington, Long was required to provide him with advance oral or written notice of the charges against him, an explanation of her evidence, and a hearing at which Plaintiff had a reasonable opportunity to respond.

That is not what happened here. The March 24 meeting was not a "pre-" termination meeting – it was a surprise termination meeting by Long in the presence of Human Resourced Director Ed Ramsey and Deputy Human Resources Director Kelsey Braido. Plaintiff had no reason to believe he was about to be terminated on the spot, nor was he provided with advance notice of the basis for such termination. Long unequivocally testified that it was entirely her choice "to not have a hearing before he was terminated," but to simply terminate him. (Doc. 36, PageID 1217-1218.)

At the outset of the meeting, Long announces:

[W]e have made a decision that we're going to have to terminate - - that I'm going to be terminating your employment with the City.

Here is the letter. If you want to read that, please do. One of those copies is for you.

It's just one of those things where I look for my leadership to be able to keep a pulse on the department. And I don't want to get involved. I want you all to have an environment in which everyone is essentially feeling like they are feeling protected and have a way to be able to raise their hand and have a process, and just management of the department is just -- you've lost that pulse. So this is the direction.

(Doc. 42, PageID 1830; Recording 00:09 - 1:09.)

The termination letter that Long hand-delivered states: "Effective March 24, 2023, *you are being separated from employment and dismissed from your position as Fire Chief*… Article V, Section 6 of the Charter of the City of Cincinnati." (Doc. 36-2, emphasis added.) The letter does not refer to prior disciplinary charges but vaguely asserts that Long has "spoken to you regarding your performance several times," and purports to list – in bullet point format - "[t]he issues …discussed." (*Id*.) The five bullet points accuse Plaintiff of a failure to initiate a climate assessment to evaluate workplace culture, being unavailable during an apartment fire, disobeying Long's directive to consult with the HR Director regarding a lieutenant's return to duty, ineffective management of the acquisition of a training center for the Fire Department, and ineffective communication with Long and "various directors within the City Administration." (Doc. 36-2, PageID 1526-1527.) The letter concludes: "Per the language in the City Charter, you have the right to demand that these issues be presented to you as written charges and the right to an audience with me to hear your defense." (*Id*., PageID 1527.)

After Long's one-minute termination speech and handoff of the letter, HR representative Ramsey states: "According to… the charter, you do have the right to demand issues be given to you in a written form, these charges to be heard (inaudible)." (*Id*. at 1830-31; Recording at 1:12-1:19.) Plaintiff's surprise is evident from the Recording

and Transcript as well as from the parties' testimony. After a period of silence, Plaintiff's response is largely inaudible. "I just - I just need [inaudible]," (Recording 1:37.) Long responds "That's fine" and "Okay." (*Id.*, PageID 1831.) [6] She then departs the meeting, leaving the two HR representatives behind to collect any public property in Plaintiff's possession.

Citing to the audio Recording and to his own testimony,[7] Plaintiff asserts that "[t]he entire interaction" between Long announcing that he was fired and her departure was less than three minutes.[8] Although the Transcript does not reflect the time of Long's departure, the Recording confirms that timeline.[9] Long states that she needs to leave roughly two minutes into the meeting, just after terminating Plaintiff. There is no further record of her voice.

In April of this year, in *Hieber v. Oakland Cnty., Michigan*, 136 F.4th 308,[10] the Sixth Circuit reversed a grant of summary judgment to the defendant on a due process claim based on evidence that would support a conclusion that the county had not provided: (1) sufficient oral or written notice of the charges against the plaintiff; (2) an explanation of its evidence; and (3) an opportunity for the employee to respond. In *Hieber*, county counsel had conducted an investigatory interview with the plaintiff relating to the

---

[6]Long testified to her recollection: "He had a moment where he was saying he couldn't believe this was happening and he needed to breathe and everything...." (Doc. 36, PageID 1205.)

[7]The City recorded the meeting, unbeknownst to Plaintiff at the time. Both the audio recording and a written transcript have been filed of record. (*See* Doc. 39, Notice of filing of USB audio recording, received 5/27/25 ("Recording"); *see also* Doc. 42, PageID 1828-1842, ("Transcript.")).

[8]*See* Plaintiff's Proposed Statement of Undisputed Facts, Doc. 38-1, ¶ 9.

[9]Long's testimony that she was in the meeting room for roughly 15 minutes or"[m]aybe shorter," does not create a genuine issue of material fact. (*See* Doc. 36, PageID 1204). Long also testified that the time in which she and Plaintiff were in the room together was shorter, because Washington arrived late after mistakenly going to the wrong place. (*Id.*, PageID 1205.) She does not dispute that once Plaintiff appeared, she spoke only briefly to terminate him before leaving.(*Id.*, PageID 1203-1204.)

[10]Neither of the parties cite to *Hieber*, which was published close in time to when the parties filed their respective motions.

charges prior to termination, and had provided formal written notice of the charges and the evidence against Hieber a day before a formal pretermination hearing. But the reasons for the termination did not fully align with the reasons that Hieber was provided. And at the formal hearing, at which Hieber was represented by counsel, the hearing officer and an HR representative both made statements consistent with the plaintiff's understanding that "termination was a predetermined outcome" and that he would not be permitted to "plead his case" at that time. *Id.*, 136 F.4th at 323.

The record in this case reflects far less pretermination process than the court reviewed in *Hieber*. In addition with Long's failure to provide adequate notice of the charges or of the evidence against Washington before the meeting, Washington was denied the most "critical" element of procedural due process  - a reasonable opportunity to respond. *Hieber*, 136 F.4th at 322 (quoting *Buckner*, 901 F.2d at 405). After terminating Washington, Long departed without waiting for him to read her letter.[11]

The undisputed record defeats Defendants' argument to the contrary. As Washington begins to read, Ramsey advises him of the "process" telling Washington that he can

> get these [bullet points] in writing in charge format and demand a hearing before a hearing officer. That's the process in the charter. Is that what you want? *You don't have to make a decision right now.*

(Doc. 42, PageID 1834-1835, emphasis added.) After responding that "I'm not [making a decision right now] because I'm reading these --" (*id.*, PageID 1835), Plaintiff continues to exclaim and ask questions about the evidence to which the charges refer:

> WASHINGTON: …I'm reading these bullet points and it doesn't – it's not the truth. I mean, I'm a college-educated man and I'm sitting here going,

---

[11]The Recording reflects 2 minutes of silence after Long departs, consistent with Plaintiff reading through the letter. (Recording; *see also* Doc. 42, PageID 1831.)

communication with my office and various directives within the City administration has not been effective. What does that mean? Who are we talking about?

RAMSEY: We're not going to get into (inaduble) –

WASHINGTON: I understand.

RAMSEY: -- want you to understand what the process is. One of these copies I need to get you to sign.
Do you want the written charges?

WASHINGTON: Huh?

RAMSEY: Do you want these in charge format?

WASHINGTON: Yeah.

RAMSEY: It reiterates the bullet points and ties it back to the issues in the charter.

WASHINGTON: I mean, I tried (inaudible) I'm reading this and I'm going, her own observations? They said they were going to order a climate assessment. What in – what the hay [sic] – this –

RAMSEY: Sir, I suggest taking it home, processing it, return it [to] me or Kelsey in the next week, if you want. In the meantime, though, we do have the unfortunate duty of going through the property that you may have and making sure (inaudible). Is there anything you need specifically from your office today?

(*Id*., PageID 1835-1836.)

Throughout the 16-minute Recording, Plaintiff utters expressions of protest and disagreement as he reads. (*See, generally*, Doc. 42, PageID 1832-1836.) Plaintiff's surprise and dismay is evident. "This is not right." (Recording, 5:51-5:52). "I don't understand" (*Id*., 6:23-6:25.) "It doesn't make any sense." (*Id*., 6:28-6:29.) "I didn't mess up anything." (*Id*., 6:38-6:41.) "You don't sit and have a conversation with me before you fire me?" (*Id*., 7:05-7:09.) "This doesn't make any sense." (*Id*., 7:41-7:44.) "What is this? I mean, I would like for someone to explain each one of these bullet points because I

don't understand." (*Id.*, 8:07- 8:15.) "Umm… I - I jus - I just need a moment. This is a lot. This is a lot. I need a moment" (*Id.*, 10:56-11:05.)

Apart from reassuring Washington that he did not "have to make a decision right now" about a hearing, Ramsey cut off any discussion of the letter's bullet points or of the evidence on which Long based her termination decision. Ramsey reiterates that his intention is to ensure that Washington understands "the process" and to have Washington sign a copy acknowledging receipt of the letter. (Doc. 42, PageID 1835.) When Ramsey asks again if Washington wants "written charges," Washington responds affirmatively. (*Id.*)

To be meaningful, notice of the basis for disciplinary action must be provided before the hearing. By failing to provide Plaintiff with any meaningful notice of the charges or evidence against him before March 24, and with no meaningful opportunity to respond during the meeting prior to his termination, Defendants denied Plaintiff the most basic and minimal components of procedural due process. *See Lane v. City of Pickerington*, 588 Fed. Appx. 456, 464 (6th Cir. 2014); *McDaniel v. Princeton City School Dist. Bd. of Educ.*, 45 Fed. Appx. 354, 358–59, 2002 WL 1893558, at *4 (6th Cir. 2002). *Contrast Hieber*, 136 F.4th at 323 (holding that a jury question existed regarding the adequacy of pretermination process during an investigatory interview, but that plaintiff received adequate written notice of the charges and evidence the day before the formal pretermination hearing); *McGowan v. Cuyahoga Metropolitan Housing Authority*, No. 99-3921, 2000 WL 1140758, at *2 (6th Cir. Aug. 8, 2000) (notice provided four hours before the pretermination hearing was sufficient under circumstances, where the plaintiff was

24

already aware of EEOC charges and an ongoing investigation, and the EEOC had found cause for discrimination after months of its own investigation).

Defendants now claim that the bullet points in the termination letter provided notice of the charges for termination (though not in the specific charge format that Ramsey offered). But the bullet points do not satisfy due process. Even if Washington had an inkling that the meeting was to discuss his job performance, the letter handed to him at the meeting did not provide him with pretermination notice either that his property interest in continued employment was on the line or of the charges on which his termination would be based. The termination letter also lacks information concerning the evidence that underlies the bullet points, and Plaintiff's requests for an oral explanation were denied.

In granting summary judgment to Plaintiff on his pretermination due process claim, the Court recognizes that what satisfies the constitutional minimum required for a pretermination "hearing" may vary. Even an informal meeting before termination *might* satisfy the Due Process Clause if the employee has been given adequate notice of the nature of the meeting and the charges against him, particularly where the employee admits the charges and adequate post-termination procedures exist. *See Martinez v. Cuyahoga Cnty. Recorder's Off.*, No. 1:08-CV-2904, 2009 WL 10688196, at *6-8  N.D. Ohio Sept. 16, 2009) (noting the adequacy of pretermination process presented a "close" issue where the decisionmaker had prepared a letter of termination before the termination meeting, but upholding the process as adequate despite the brevity of the meeting where the decisionmaker testified that she did not make a final decision to terminate until after the employee admitted to a terminable offense and comprehensive post-termination procedures existed); *Lusher v. City of Mansfield*, 2007 WL 756655, at *3, 8-9 (N.D. Ohio

2007) (holding that firefighter "was not unfairly surprised" by 20-30 minute meeting that doubled as a pretermination hearing, where record showed numerous prior warnings and at least two other formal meetings attended by superiors and union officials, and when asked for his response, firefighter admitted alcohol violation in breach of Letter of Understanding and Last Chance Agreement).

Here, however, no reasonable jury could conclude that Long complied with minimal constitutional standards on March 24, 2023. As he read through the termination letter after Long's departure, Washington expressly or implicitly denied all charges. He questioned Long's decision not to "have a conversation with me before you fire me," and repeatedly stated, "I don't understand." Any alleged "opportunity to respond" that was provided to Washington during the March 24 meeting was not only post-termination (given Long's departure), but was so nominal and illusory as to be no opportunity at all.

### 2. The Adequacy of Post-Termination Process and a Potential Waiver

"[T]he required extent of post-termination procedures is inextricably intertwined with the scope of pretermination procedures." *Carter v. W. Rsrv. Psychiatric Habilitation Ctr.,* 767 F.2d 270, 273 (6th Cir.1985) (per curiam) (citing *Loudermill,* 470 U.S. at 547-48, 105 S.Ct. 1487); *Mitchell v. Fankhauser*, 375 F.3d 477, 481 (6th Cir. 2004) (holding that a post-termination hearing is not always required, if the pretermination hearing is sufficiently "meaningful."). A post-termination cannot wholly cure the earlier constitutional violation, *see Durante v. Ohio Civil Rts. Com'n*, No. 86-AP-591, 1987 WL 11611, at *2 (Ohio App., 10th Dist. May 19, 1987), but a robust and comprehensive post-termination hearing before a neutral arbiter may support a limitation of damages for the pretermination violation. *See Valan v. Cuyahoga Cnty. Sheriff*, 499 N.E.2d 377, 383, 26 Ohio App.3d

166, 171-72 (Ohio App. 1985) (holding that a plaintiff can recover nominal damages even if court determines on remand that the plaintiff was appropriately discharged.)

Above, this Court has reaffirmed its prior holding that the Charter "designate[s] the Fire Chief position…. as a classified (in the legal-term-of-art sense of the word), for-cause-terminable position" after six months of employment, and that Washington therefore held "a cognizable property right in his classified (in the legal-term-of-art sense) position protected by the Due Process Clause." (Doc. 13, PageID 170.) Under Ohio law, Washington was entitled to a full administrative hearing and judicial review before a neutral arbiter following his or her termination. *See, generally,* Ohio R.C. § 124.34; *Loudermill*, 470 U.S. at 546; *Farhat v. Jople*, 370 F.3d at 596 (confirming that procedural due process requires "a post-deprivation hearing before a neutral decisionmaker.")

Plaintiff requested a post-termination hearing before a neutral arbiter but Defendants offered only a hearing before Long based on the City Charter. (Doc. 40-7, PageID 1800; *see also id.*, PageID 1801.) Plaintiff's counsel protested that a hearing before Long "seems pointless, since she has already fired him, and has made several public statements defending and justifying her decision." (*Id.*, PageID 1801.) He inquired "if the City would consider delegating the hearing to another official or third party not answerable to the City Manager, who would be in a position to review the matter de novo, and whose decision would not be subject to review by the City Manager." (*Id.*) The City rejected Plaintiff's proposal.

Defendants' first defense to the denial of a post-termination hearing before a neutral arbiter is a reiteration of the argument that Washington had no constitutional due process rights. That argument is a nonstarter. Next, they suggest that the limitation to

27

Long is supported by the Charter language. But the Charter speaks only to pretermination process, not to the process required for a post-termination hearing.

Defendants alternatively argue that Long *could have* acted as a neutral arbiter. Building on that premise, they reason that Plaintiff waived any post-termination due process rights by failing to move forward with the post-termination hearing that was offered. To support waiver, Defendants cite to *Farhat*. But in *Farhat*, a neutral decisionmaker would have presided over the post-termination hearing. As the court emphasized, neutrality would have allowed "bias and corruption [to be] ferreted out." *Id.*, 370 F.3d at 597. By contrast, Long selected Washington's interim replacement before his termination, and proceeded to terminate him in violation of his constitutional pretermination due process rights. After doing so, she published arguably defamatory statements (more on that later) about the reasons for his termination. Long testified that she had no intention of reinstating Plaintiff at the time of termination. (*See* Doc. 36, PageID 1230.) In other words, evidence of some bias by Long is indisputable.

Does that mean that Washington was permitted to skip the hearing in front of Long and seek recovery in this Court for the post-termination violation? That is a much closer question. A plaintiff who elects not to participate in a post-deprivation process that is offered must prove that it would have been futile to participate. *See Durham v. Eley*, 507 F. Supp. 3d 956, 969 (M.D. Tenn. 2020).

Defendants quote from *Silberstein v. City of Dayton*, 440 F.3d 306, 314 (6th Cir. 2006) in support of their argument that a post-deprivation hearing before Long was not futile. But the quotation is mere dictum. Because post-termination due process ordinarily requires a neutral arbiter, the City of Dayton had suggested that a Charter provision that

would require Silberstein to appeal to the Board that had terminated her meant she was not classified. The Sixth Circuit rejected the implication that the provision defeated Silberstein's classified status, reasoning that an appeal to the same decisionmaker would not be "inherently vain or useless" since the Board could change its mind on reconsideration in a more formal setting. *Id.* In the context of ruling that Silberstein was classified, the court never considered whether such an appeal would satisfy due process. And the court went on to point out that the cited provision was "not likely to apply to Silberstein." *Id.* In other words, *Silberstein* suggests only that the question of whether a post-termination hearing before the same decisionmaker is futile remains unsettled.

In support of his claim of futility, Plaintiff cites to *Nichols v. Dwyer*, 856 Fed. Appx. 589, 599 (6th Cir. 2021) and to *Rodgers v. 36th Dist. Court*, 529 Fed. Appx. 642, 649 (6th Cir. 2013). In *Nichols*, the plaintiff was given a constitutionally adequate pretermination hearing but was denied post-deprivation process that the plaintiff was contractually entitled to invoke under a collective bargaining agreement. The Sixth Circuit held that he had adequately pleaded that post-deprivation process was unavailable to him. In part, it relied on its earlier decision in *Rodgers*, another case involving CBA-related procedures that provided for arbitration before a neutral decisionmaker. In *Rodgers*, the court held that state employees could recover on the post-deprivation claim because the state court employer had refused to allow them to arbitrate before a neutral arbiter.

The recent *Hieber case* is also relevant. There, the Sixth Circuit held that the plaintiff waived his right to sue for any post-termination due process violation, despite the plaintiff's apparent belief that the process was flawed. Hieber was offered and initially appeared with counsel at a formal post-deprivation hearing before a three-person panel.

But at the hearing, the panel declined to consider his presentation of testimony through affidavits. The panel offered to reconvene the hearing at a later date so that the witnesses who had provided affidavits could testify. After initially agreeing to the continuance, Heiber abandoned his post-termination appeal and filed suit. The Sixth Circuit affirmed the trial court's grant of summary judgment on Hieber's post-termination claim based on his refusal to move forward with the reconvened hearing that was offered.

The facts of this case fall somewhere between *Nichols* and *Rodgers*, in which no post-deprivation process was offered at all, and *Hieber*, in which the plaintiff began a comprehensive post-deprivation hearing before a three-person panel but later abandoned the hearing. On the record presented, a reasonable jury could find that the offer of a post-deprivation hearing before Long was so inadequate as to be no meaningful process at all. But based on *Hieber*, a reasonable jury might also conclude that Washington's refusal to participate in the post-termination hearing that was offered before Long was an unreasonable abandonment of his post-deprivation due process claim. In short, genuine issues of material fact remain concerning the adequacy of the post-termination hearing and waiver. *See also*, *generally, Huggins v. City of Dayton*, No. 3:03-cv-300-WHR,.2008 WL 728324 (S.D. Ohio Mar. 14, 2008).[12]

### E. The City is Not Entitled to Summary Judgment Under *Monell*

Defendants briefly argue that Plaintiff has failed to show that it had a policy or custom of terminating its employees in violation of the Due Process Clause. But the City's

---

[12]The unpublished *Huggins* is not fully persuasive, in part because the court granted judgment on arguments not raised here – that the plaintiff's failure to exhaust her administrative remedies under state law deprived the court of subject matter jurisdiction. In addition, the *Huggins* court noted an ambiguity about whether the plaintiff was actually required to appeal to the same decisionmaker or to a different administrative body. *Id.*, 2008 WL 728324, at **7-9.

suggestion that Long's violations of due process were nothing more than "an isolated incident" does not insulate the City from liability because she was an "authorized decisionmaker[].'" *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1118, 1994 Fed. App. 0015P, 4-5 (6th Cir. 1994). In short, "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Long's actions fairly represented the City's policy; therefore, the City cannot escape liability under *Monell*.

### F. Defendants' Assertions of Federal and State Immunity

In its February 2024 denial of Defendants' motion to dismiss, the Court rejected Defendants' assertion of immunity for Long under both federal and state law. Defendants now renew their assertion of immunities for Long in her individual capacity while adding a new claim of immunity for the City. The Court rejects assertions of immunity for Long, but finds merit in the City's assertion of immunity.

#### 1. Long's Assertion of Qualified Immunity for the Federal Due Process Violation[13]

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 341 (1986)). "To overcome a defendant's assertion of qualified immunity, a plaintiff must show

---

[13]Qualified immunity applies – if at all – only to the federal due process claim brought under § 1983 and not to any state claims. *See Williams v. Godby*, 732 Fed. Appx. 418, 424-25 (6th Cir. 2018).

both (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time of the violation." *Downard v. Martin*, 968 F.3d 594, 599-600 (6th Cir. 2020) (citing *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009)).

Here, Long's conduct in terminating Plaintiff on March 24 without a pretermination hearing violated the Due Process Clause. Long testified that she did not "personally" review the Charter language before making the decision to terminate Plaintiff without a hearing, and did not ask anyone to review that language prior to terminating Plaintiff. (PageID 1208, 1210.) She provided Human Resources with notice of her decision as well as her "coms [communications] team." (Doc. 36, PageID 1209.) In response to a question asking if she had "consulted with legal prior to the termination"(to which no objection was made), Plaintiff responded: "They - - the hearing component of it? They were aware that - - *when I let them know that I was going to make that decision*, *they told me* …. *[t]hat he would need a hearing*." (*Id.*, PageID 1209, emphasis added). She chose "to not have a hearing before he was terminated," (*id.*, PageID 1217), because she believed that "It was my choice to choose termination versus a hearing." (*Id.*, PageID 1218). She therefore fired him and then gave him a letter telling him he could request a post-termination hearing. (*Id.*, PageID 1224; *see also id.*, PageID 1233, responding affirmatively that "[y]ou know for a fact that you did not give Chief Washington a hearing before you fired him, correct?") Long also testified that she never gave Plaintiff any "[e]mployment reprimands" prior to terminating him, despite alleging she gave him "directives" with which he failed to comply. (*Id.*, PageID 1242.)

Because Plaintiff has established that Long violated his right to a pretermination hearing, the only remaining issue for qualified immunity purposes is whether his right to

pretermination process was "clearly established." Judge Cole previously held that it was, rejecting Defendants' contrary interpretation under state law:

> [T]he right is clearly established because this is a simple application of the consistent line of cases recognizing that "[f]or public employees who can only be fired for cause, the Supreme Court has held, specifically, that a pre-termination proceeding is required." *Farhat*, 370 F.3d at 595. Given Washington was a public employee removable only for cause, Long's decision to end Washington's employment allegedly without notice or a hearing flouted clearly established Sixth Circuit and Supreme Court precedent.

(Doc. 13, PageID 188.) The undersigned finds no reason to depart from the Court's prior analysis of this issue.

Reiterating the argument previously made in their motion to dismiss,[14] Defendants assert that Plaintiff's right to a pretermination hearing was not "clearly established" based on *Prophett* and because "this case is the first time Article V, Sec. 6 has been interpreted in connection with the termination of the City's fire chief since its 2001 revision." (Doc. 40, PageID 1746-1747.) The Court rejects the argument for the reasons previously stated.

> Defendants argue that the right at issue is not clearly established because their (erroneous) interpretation of *Prophett* supports their (mistaken) contention that Washington had no property interest in his continued employ as Fire Chief. (Doc. 11, #153). As explained, *Prophett* involved an assistant fire chief who was not afforded the for-cause removal protections to which Washington was entitled. … That renders *Prophett* inapposite on the facts here, not only on the merits but also as to qualified immunity. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (requiring cases proffered as factually analogous "to speak [] to the specific circumstances" at bar for the clearly established prong of qualified immunity).

(Doc. 13, PageID 189.)

In contrast to the denial of qualified immunity for the pretermination violation, it appears that Long is entitled to qualified immunity for the post-termination violation. All

---

[14]Defendants reassert the argument "for purposes of appeal." (*Id.*, n.1 PageID 1747.)

evidence of record suggests that it was the City, and not Long personally, who denied Plaintiff's counsel's request for a more neutral arbiter. *See Hieber*, 136 F.4th at 324 (holding that a defendant was entitled to qualified immunity because the record reflected he was not personally involved in the pre-deprivation due process violation.)

### 2. Defendants' Asserted State Law Immunity for Defamation

For the defamation claims under state law, Defendants invoke statutory immunity.

### a. Long is not Entitled to Statutory Immunity

An employee of a political subdivision is entitled to immunity under state law, but that immunity is explicitly waived if the employee acted "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b).[15] For the reasons discussed below, the Court concludes that a reasonable jury could find that Long acted in bad faith and/or in a wanton or reckless manner when she intentionally published demonstrably false and defamatory statements. In short, genuine issues of material fact preclude summary judgment because "Long's express knowledge of Washington's due process rights and direct disregard for those rights lays a sufficient foundation from which the Court may reasonably infer that Long acted maliciously and in bad faith." (Doc. 13, PageID 190.)

### b. The City is Entitled to Statutory Immunity

Ohio R.C. § 2744.02(A)(1) also establishes immunity under state law for political subdivisions for any injuries or deaths in connection with the political subdivision's performance of a governmental or proprietary function. The publication of alleged defamatory statements by Long occurred in connection with the operation of the City's

---

[15] State law immunity cannot insulate Long from liability on Plaintiff's federal law claim. *See Martinez v. California*, 444 U.S. 277, 284 n.8 (1980).

Fire Department, which is a governmental function. So unless an exception applies, the City is entitled to immunity.[16]

Plaintiff argues that an exception applies to the City under Ohio R.C. § 2744.02(B)(5), which provides for liability "when civil liability is expressly imposed" by some other statutory provision. *Id*. Citing to the waiver of immunity that applies to Long under Ohio R.C. § 2744.03(A)(6)(b), Plaintiff argues that the City should also be held liable for her actions. But the referenced statute does not provide an additional exception to immunity for the City based on the errant acts of its employee in her individual capacity. Thus, the Court grants summary judgment to the City under Ohio R.C. § 2744.02(A)(1) on Plaintiff's defamation claim. *See  Price v. Austintown Local Sch. Dist. Bd. of Edn.*, 897 N.E.2d 700, 702, 178 Ohio App.3d 256, 259, 2008-Ohio-4514, ¶ 1 (Ohio App. 7 Dist., 2008) (holding that there is no exception in R.C. 2744.02(B) to the school board's immunity for a defamation claim)*; see also, generally, Gray v. Winton Woods City Schools*, No. 1:23-cv-553-DRC, 2024 WL 2882645, at *5 (S.D. Ohio, June 7, 2024) (granting immunity on defamation claim); *Stager v. Hanshaw*, No. 1:23-cv-120-DRC, 2024 WL 1556708, at *10 (S.D. Ohio, April 10, 2024) (granting immunity to county under state law for deputy sheriff's alleged intentional tort, because exceptions to immunity "are limited to negligent conduct" and no provision of the Ohio Revised Code expressly imposes liability upon a public agency for intentional torts).

### G.  Issues of Material Fact Preclude Judgment on the Defamation Claims

Defendants also seek summary judgment on the merits of Plaintiff's defamation claims. They argue that Plaintiff has insufficient proof to submit to a jury on the core

---

[16]The same analysis applies with respect to Plaintiff's defamation claim against Long in her official capacity, which is duplicative of the claim against the City itself.

elements of defamation, including whether Long's statements included false statements of fact rather than mere opinion and whether Washington was injured. Next, Defendants maintain that Long's statements were privileged. Last, they assert that Washington cannot show that Long acted with actual malice. Evaluating the record in favor of Washington as the nonmoving party, the Court concludes that genuine issues of material fact remain on the issues presented. Therefore, Long is not entitled to summary judgment on the defamation claims filed against her in her individual capacity.

### 1. A Jury Could Find the Long Published False Statements of Fact that Damaged Washington

"To establish defamation, the plaintiff must show (1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement." *Am. Chem. Soc. v. Leadscope, Inc.*, 978 N.E.2d 832, 852, 133 Ohio St.3d 366, 389, 2012-Ohio-4193, ¶ 77 (Ohio 2012) (quoting *Pollock v. Rashid*, 690 N.E.2d 903, 908, 137 Ohio App.3d 361, 368 (Ohio App. 1st Dist. 1986). The last element – the requisite degree of fault – differs for public officials like Washington. A public official must prove that the defamatory statements were made with "actual malice." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964).

Long admits to publication of the statements in the termination letter and Memorandum[17] but contests on summary judgment whether the statements were "mere

---

[17]In a footnote, Long suggests that the "only published statements that remain part of Plaintiff's defamation claim are the termination letter" and the Memorandum. (*See* Doc. 40, n. 2, PageID 1747, citing Doc. 13, PageID 187). In context,  the Court understands the February 2024 opinion as holding that the only actionable statements of fact specifically alleged in the First Amended Complaint were those contained in

opinion" or statements of fact, whether the statements were false, and whether Washington was injured. The Court stands on its prior ruling that the statements are not mere opinion. (*See* Doc. 13, PageID 178, citing amended complaint and exhibits attached thereto.)[18] The statements are framed to imply that Long had first-hand knowledge of the events disclosed, and contain multiple recitations of fact.

> For example, Long claims [in the termination letter] that Washington did not implement a workplace culture plan, blamed staff for the failure to do so, and had taken no actions regarding workplace culture…—all verifiable statements that either did or did not happen. Similarly, Long asserts that Washington blamed subordinates for his failure to be present for a fire and disobeyed directives regarding disciplining a subordinate by not contacting an HR director and not involving Long in the determination of what discipline was appropriate. …Again, one could prove whether these events did or did not happen. Long's gloss on these actions (or inactions) as creating the impression of incompetence and mismanagement might alone constitute protected opinion. But when made in a formal termination letter in connection with concrete examples supposedly justifying her opinion, the statements are legally verifiable and therefore falsifiable….

> This analysis compels the same result for Long's memorandum to the Mayor explaining her termination decision. A review of the [Memorandum]… reveals specific examples of misconduct (e.g., "multiple women have come forward with concerns about the workplace environment," Washington "never moved forward" with the climate assessment) that support her bottom-line conclusion that "Washington has proven to be an ineffective leader who is unwilling to take ownership for his decisions." … And just as before, the verifiable actions alleged to have occurred anchor the statements of opinion and thereby support the Court's conclusion that the statement is actionable. In context, Long's memorandum (incidentally labeled "For Your Information") purports to represent to the Mayor exactly what happened with Washington to explain why she took the action that she did. *Mallory v. Ohio Univ.*, 2001-Ohio-8762, at *5–*8 (10th Dist.) (holding that statements made by an employee of the defendant in an article, which implied that she was privy to specific details of a sexual assault the plaintiff allegedly perpetrated, constituted actionable

---

the termination letter and the Memorandum. Plaintiff filed a Second Amended Complaint and the parties conducted extensive discovery that revealed evidence of the same statements published to the media. (Docs. 36-24, 36-25). Plaintiff may present evidence of publication to the media of the same allegedly defamatory statements previously held by this Court to state a defamation claim.

[18]The Court examined the copy of the termination letter and Memorandum attached as exhibits to Plaintiff's First Amended Complaint. Long testified to the authenticity of the exhibits at her deposition. (*Compare* Docs. 7-3 and 7-4 with Docs. 36-2, 36-4.)

defamation, even though the statements were surrounded by the occasional opinion statement). And that the letter was written to provide context and to explain Long's actions means a reader would reasonably conclude that Long was reporting the facts as they happened, not peddling her opinion.

(Doc. 13, PageID 178-180.)

Defendants further argue that even if not merely opinion, any factual statements are true. But genuine issues of material fact remain on that issue. For example, Long states in her Memorandum that Washington "has never moved forward" with a climate assessment that he was directed to conduct in November 2021, and "showed no attempt to pursue long-term, sustainable culture change." (Doc. 36-4.) Plaintiff cites to testimony that he tried to move the climate assessment project forward by completing a draft RFP and following up by email and by phone. (Doc. 36, PageID 1328, 1333; Doc. 34, PageID 856; Doc. 35, PageID 1121; Doc. 33, PageID 310.) Long also accuses Washington of showing "a disregard for direct orders from her and …on more than one occasion, misrepresent[ing] the direction provided." (Doc. 36-4.) In the termination letter, she states that"[i]nstead of consulting the HR Director…, you contacted me, ignored HR guidance without rational justification, reached an undocumented agreement absent any oversight by me or my designee, …and misrepresented my directives to others." (Doc. 36-2.) But Washington cites to evidence including emails that reflect that he did in fact consult with the HR Director, and did not ignore his guidance because Ramsey made clear that the decision was "up to you." (Doc. 36-11, PageID 1577; *see also*, Doc. 36-1, PageID 1420.) Plaintiff's evidence is sufficient to create a triable issue on whether Long's statements were true.

The Court also finds genuine issues of material fact exist on the extent of Plaintiff's injury. Long points out that Washington testified to obtaining a new position with a fire department in Mariemont, Ohio. But a reasonable jury could find that the statements were defamatory[19] and that they caused professional injury to Washington by derailing his ability to secure employment as a Fire Chief despite an extensive national search. (Doc. 33, PageID 348-349.) In addition, to the extent that the statements are viewed as defamation per se under Ohio law, damages are presumed. *See Knowles v. Ohio State Univ.*, 2002-Ohio-6962, ¶ 26, 2002 WL 31819687 (Ohio App. 10th Dist. 2002).

## 2.  Qualified Privilege Does Not Apply

Even if this Court concludes that Long published false and defamatory statements of fact that injured Washington, Defendants assert a public interest privilege. Ohio law recognizes a qualified or conditional privilege for statements that are published in the public interest, even if the statements would otherwise constitute defamation, so long as the speaker did not make the statements with actual malice. In order to invoke this affirmative defense, the speaker must first prove the elements of the privilege, which are "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." *Hahn v. Kotten*, 43 Ohio St. 2d 237, 245-46 (1975) (internal quotation marks and additional

---

[19]The Court previously found that the statements satisfied the "defamatory" element of a claim..
> A review of the assertions about Washington's refusal to support workplace culture and initiatives related to women in both the letter and the memorandum reasonably suggest to the reader that he should conclude that Washington could not be bothered to contain the hostility and sexism allegedly running rampant in the Fire Department…. Similarly, Long's statements detailing his failure to manage the Fire Department effectively, to take responsibility as a leader, and to follow orders all suggest Washington was an incompetent and incapable leader. … Those personal and professional attacks culminating in Washington's termination are defamatory.

(Doc. 13, PageID 184.)

citations omitted). "The qualified privilege 'does not change the actionable quality of the publication,' but it heightens the degree of fault that a plaintiff must establish to recover" because a plaintiff must prove actual malice to defeat the privilege. *Anderson v. WBNS-TV, Inc*., 255 N.E.3d 755, 768, 2024-Ohio-4880, ¶ 33 (Ohio App. 10 Dist., 2024) (quoting *A & B-Abell Elevator Co.* at 9, 651 N.E.2d 1283.)

"Whether an allegedly defamatory statement is subject to a qualified privilege is a question of law for the court when… the content of the alleged defamatory statement and the circumstances of the occasion for the communication are not in dispute." *Id.*, 255 N.E.3d at 768-69 (footnote and additional citations omitted). Because it is an affirmative defense, Defendants bear the burden of proving there are no genuine issues of material fact for each element of the asserted privilege. *See Utz v. Stovall*, 2013 -Ohio- 4299, ¶ 23, 2013 WL 5444546, at *5 (Ohio App. 11 Dist., 2013).

Defendants assert that Long's statements were privileged because the statements were a good faith "publication …to inform the public about a significant personnel change." *See Wrenn v. Ohio Dep't of Mental Health & Mental Retardation*, 16 Ohio App. 3d 160 (Ct. App. 10th Dist. 1984) (holding that the release of limited information regarding the termination of the Superintendent of Toledo Mental Health Center in response to media inquiries was privileged.) The Court agrees that it is reasonable to presume a good faith[20] motive for a city manager to communicate about the termination of a public official. And it does not strain credulity to assume that same innocent motive exists for a limited

---

[20]"The issue of 'good faith' necessary to establish the privilege should not be confused with the issue of 'state of mind' necessary to defeat it." *Utz v. Stovall*, 2013-Ohio-4299, ¶ 45, 2013 WL 5444546, at *8 (additional citations omitted). Rather than delving into Long's actual motivation in publishing the statements, the Court must consider whether there is a "reasonable ground for supposing an innocent motive" under the circumstances presented, *Hahn* at 246,"331 N.E.2d 713; *see also A & B-Abell Elevator Co.* at 10, 651 N.E.2d 1283. By contrast, Long's subjective motivation and manner of publishing numerous statements to the media may be considered in the "actual malice" inquiry.

press release about the termination of the Fire Chief even in the absence of the type of media inquiries that precipitated the publication of statements in *Wrenn*.

Defendants' claim to the qualified privilege falters, however, when the Court considers scope. A "qualified" privilege does not give carte blanche to a speaker. Disclosure must be limited to "the situation giving rise to the communication." *Anderson,*, 2024-Ohio-4880, ¶46 (Ohio App.) (citing A *& B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg, & Constr. Trades Council*, 73 Ohio St. 3d 1, 7-8 (1995)). Here, Long's statements arguably went far beyond the type of basic information provided to the public about Washington's termination that was at issue in *Wrenn*. And she relies on no other purpose (such as an independent legal duty) that would have required her to publish the fairly extensive statements that she included in the termination letter, the Memorandum, and to media outlets where she repeated those statements or included links to those documents. *Contrast Waters v. Ohio State Univ*., Ct. of Cl. No. 2015-00457, 2016-Ohio-5260 at ¶¶ 30-31 (finding a qualified privilege existed for statements made about the plaintiff's termination because publication was connected with an investigation in a Title IX report that OSU had a legal obligation to participate in, and made in closely related press releases and public comments that explained that report.).

In contrast to Long's pro-active statements to the media, the defendants in *Wrenn* responded to media inquiries with "brief and very general" information. The *Wrenn* court reasoned that the limited information provided arguably "prevented undesirable speculation aimed at plaintiff's character and… provided necessary factual information detached from any comments of a personal nature affecting plaintiff." *Id.*, 474 N.E.2d 1201, 1206. Unlike Long, the *Wrenn* defendants did not release a written "statement of

reasons" for the non-renewal of Wrenn's unclassified position. *Id.* at 1207. In addition, the limited statement at issue (regarding high overtime use at the hospital on the Superintendent's watch) was not seriously disputed. And the court questioned "whether the statements were even defamatory in nature" given the truthful content and that high overtime use did not bear on the plaintiff's character. *Id.* at 1206. Here, Long published multiple disputed statements of fact that reflected poorly on Washington's character. Based on the broad content of her statements and the surrounding circumstances, Defendants have failed to prove that a qualified privilege applies. *Accord Utz v. Stovall*, 2013-Ohio-4299, ¶24 (finding no error in the trial court's holding that issues of material fact on whether publication exceeded "limited scope" of privilege). *Compare Hieber*, 138 F. 4th at 327 (finding publication of emails to other employees were governed by qualified privilege because they were appropriately limited in scope; made on proper occasions; and sent only to relevant parties.)

### 3. Genuine Issues of Material Fact Exist on the Issue of Actual Malice

Last but not least with respect to Plaintiff's defamation claims, Defendants argue that Plaintiff cannot prove actual malice. Plaintiff suggests that he is required to prove actual malice only if a reviewing court were to disagree with the above analysis and conclude that a qualified privilege applies.[21] But Washington was a public official. And for that reason, Washington must prove that Long made defamatory statements with "actual

---

[21] A plaintiff can defeat the assertion of that privilege if he can prove that a defendant acted with actual malice, or "knowledge that the statements are false or with reckless disregard of whether they were false or not." *Anderson*, 255 N.E.3d at 768 (citation omitted); *see also Utz v. Stovall*, 2013-Ohio-4299, ¶ 48. Such proof must be "clear and convincing." *See Jacobs v. Frank*, 573 N.E.2d 609, 614, 60 Ohio St.3d 111, 115-16 (Ohio,1991).

malice" regardless of the application of qualified privilege. See *N.Y. Times v. Sullivan*, 376 U.S. at 279-80.

Plaintiff asserts that he should not be held to prove actual malice because malice is presumed for a case of per se defamation. That may be true, but Plaintiff fails to cite to any controlling or persuasive law that a public official may rely on the same presumption to meet the *N.Y. Times v. Sullivan* standard. So Washington still must show "clear and convincing" proof that Long published her statements with knowledge they were false or with reckless disregard for the truth or falsity of the statements. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 659 (1989).

At this point, the Court returns again to its prior opinion, which considered whether Plaintiff had plausibly alleged actual malice. Despite the Rule 12(b)(6) context, the Court fully considered the statements made in the termination letter and the Memorandum that were attached to the Amended Complaint. Based on the actionable statements contained therein, the Court "easily inferred" actual malice.

> Everything encompassed in Long's statements in her termination letter and memorandum to the Mayor would be directly within her knowledge. Namely, the defamatory statements spoke to interactions between Washington and Long or Washington and her office, the latter of which would have affected Long's day-to-day duties (e.g., her office's aiding the acquisition of a new fire department training center or her staff's inability to contact Washington, (Doc. 7 ¶ 27, #67–68)). As a result, it is "at least plausible that [Long]'s statements about [Washington]'s conduct, if in fact false, were knowingly so. The allegations of knowing falsity thus create the plausible inference of actual malice[.]" *Green*, 504 F. Supp. 3d at 832.

(Doc. 13, PageID 186).

The Court also held that Washington's "allegations that Long (1) expressly disregarded Washington's due process rights by acknowledging the procedures required for termination but not providing them and (2) published false statements despite her

personal knowledge that the contrary occurred" were sufficient to infer that she acted maliciously or in bad faith. (*Id.*, PageID 190-192); "[T]his express disregard for the truth, of which she was aware, lays a proper evidentiary foundation from which to infer Long's bad faith and malice—she allegedly tarnished Washington's public reputation and used false assertions about his supposed misconduct as a basis to remove him from his post." (Doc. 13, PageID 191.)

On summary judgment, Defendants protest that Plaintiff has no evidence "that Long had any belief, let alone a high degree of awareness, that any statements within the termination letter or memorandum were false at the time of publication," or that she demonstrated disregard for the truth of any published statement. (Doc. 40, PageID 1749.) But Washington is permitted to prove actual malice by circumstantial evidence. He need not obtain a direct admission from Long that she knew the statements were false or published in reckless disregard of their truth or falsity. "The defendant in a defamation action brought by a public official cannot… automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *see also Hildebrant v. Meredith Corp.*, 63 F. Supp. 3d 732, 746 (E.D. Mich. 2014).

A reasonable jury could infer that Long deliberately chose to broadly publish false and defamatory statements without any rudimentary investigation or hearing despite her knowledge that she was entitled to dismiss Washington only "for cause" after a hearing that allowed him to respond. "Although failure to investigate will not *alone* support a finding of actual malice, …*the purposeful avoidance of the truth is in a different category.*" *Harte-Hanks Communications*, 491 U.S. at 692 (internal citation omitted, emphasis added).

Here, Long's purposeful decision not to investigate or even to permit Washington to respond to the bullet points in the termination letter, combined with making allegedly false representations of verifiable facts within her knowledge, is sufficient to support a finding of actual malice. *See also Post v. City of Munroe Falls*, 861 Fed. Appx. 69 (6th Cir. 2021). When the record contains sufficient evidence to create a genuine issue of material fact on the issue of actual malice, it should be submitted to the jury. *Id*.; *see also DeAngelo v. W. T. Grant Co.*, 111 N.E.2d 773, 776 (Ohio App. 8th Dist. 1952).

### H.  Plaintiff's Declaratory Judgment Claim Under Ohio Rev. Code § 2721.01

Plaintiff seeks a declaratory judgment against the City under state law "that he is terminable only for cause and that his termination was made without proper cause." (Doc. 13, PageID 173.) Above, the Court has determined that Plaintiff was terminable only for cause. The Court has also explained why that determination is closely connected to Washington's claim for a violation of Ohio's Due Course of Law Claim, which is only enforceable through the declaratory judgment claim and not as a separate cause of action. (*See* Doc. 13, PageID 173-174.)

Defendants no longer dispute the Court's exercise of jurisdiction over the declaratory judgment claim. (*See* Doc. 45, PageID 1905; *see also* Doc. 13., PageID 174, discussing judicial economy in addressing related claims.) Instead, the City seeks summary judgment on grounds that the Court should give "deference" to Long's termination decision. In support, Defendants cite to a 66-year-old state court case from Pennsylvania. *See Appeal of Zeber*, 156 A.2d 821, 398 Pa. 35 (Pa. 1959).

*Zeber* is easily distinguished. After a full hearing by a civil service commission, a firefighter was terminated for "unbecoming personal conduct" related to his arrest for rape,

adultery, and contributing to the delinquency of a minor, as well as an earlier incident of indecent assault upon a ten-year-old. The appellate court agreed with the trial court that there was sufficient evidence to affirm under the standard of review applicable to the judicial appeal of administrative decisions. "This Court, in a long line of cases, has refused to step in and set aside the dismissal of a municipal employee where sufficient evidence was present in the record to sustain the action of the administrative body." *Appeal of Zeber*, 156 A.2d 821, 825, 398 Pa. 35, 42 (Pa. 1959). Thus, *Zeber* merely speaks to the standard of review applicable under Pennsylvania law for judicial appeals after a full hearing before a civil service commission. It does not support automatic "deference" to Long's unilateral termination decision without a hearing under Ohio law.

In addition to urging unbridled deference, the City argues that it is entitled to judgment as a matter of law because the record contains undisputed facts that it asserts support Long's decision to terminate Washington "for cause." For example, Washington does not dispute that after his promotion, while visiting the City's firehouses with a public information officer, he directed her to cover her ears when he was about to say a curse word. While Defendants allege that Plaintiff did this "routinely," Plaintiff admits doing so "on no more than three occasions," as "a polite gesture intended to avoid cursing in front of a lady … to maintain professionalism." (Plaintiff's response to Proposed Undisputed Facts, Doc. 44-1, ¶¶ 7-8.)

The Court declines to grant judgment on the basis of the facts upon which the City now asserts that termination was based. Most of those facts were not referenced by Long during her March 24, 2023 meeting with Washington or in her termination letter. And Washington strongly disputes whether the facts that were referenced in the termination

letter constitute "cause" for his termination. Thus, the Court finds genuine issues of material fact remain on the sufficiency of the evidence relied on by Long to terminate Washington "for cause."

## IV.    Conclusion and Order

For the reasons discussed, **IT IS ORDERED THAT**:

1. Plaintiff's motion for partial summary judgment on Counts I and II (Doc. 38), construed as inclusive of stating an enforceable claim under Count II only through Count III, is **GRANTED IN PART:**

   a. Defendants Long and the City failed to provide Washington with adequate pretermination procedural due process when they terminated him on March 24, 2023, in violation of the Due Process Clause of the Fourteenth Amendment;

   b. Although the Due Course of Law Clause in Ohio's Constitution is co-extensive with the Due Process Clause in the U.S. Constitution, no stand-alone private right of action exists to enforce a state constitutional violation of due process, except through Plaintiff's Declaratory Judgment claim (Count III);

   c. To the extent that Plaintiff seeks a declaratory judgment relating to Count II, Plaintiff is entitled to partial judgment declaring that he had a property interest under state law after six months of employment at which time he could be terminated only "for cause";

2. Defendants' motion summary judgment (Doc. 40) is also **GRANTED IN PART**:

    a. Long is entitled to qualified immunity in her individual capacity for the post-termination federal due process claim under 42 U.S.C. § 1983;

    b. The City (and Long in her official capacity) are entitled to statutory immunity on the defamation claims.

3. These remaining issues shall proceed to trial: (a) the adequacy of the post-termination process and whether Plaintiff waived his post-termination hearing; (b) whether Defendants had cause to terminate Plaintiff; (c) whether Defendant Long defamed Plaintiff; and (d) what damages, if any, Plaintiff may recover.


                             *s/Stephanie K. Bowman*
                             Stephanie K. Bowman
                             United States Chief Magistrate Judge